# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* ) | Case No._____ |
| [UNDER SEAL] ) | |
| ) | **FILED UNDER SEAL** |
| *Plaintiffs,* ) | **PURSUANT TO 31 U.S.C. § 3730(B)(2)** |
| ) | |
| ) | **COMPLAINT FOR VIOLATIONS OF** |
| ) | **THE FEDERAL FALSE CLAIMS ACT,** |
| **v.** ) | **31 U.S.C. §§ 3729,** *ET SEQ.* |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| [UNDER SEAL] ) | |
| ) | |
| ) | |
| ) | |
| *Defendants.* ) | **JURY TRIAL DEMANDED** |
| ) | |

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **STATE OF TENNESSEE** *ex rel.* | ) | Case No._____ |
| **LAURA ALLEN-MOORE** | ) | |
| | ) | **FILED UNDER SEAL** |
| *Plaintiffs,* | ) | **PURSUANT TO 31 U.S.C. § 3730(B)(2)** |
| | ) | COMPLAINT FOR VIOLATIONS OF |
| | ) | THE FEDERAL FALSE CLAIMS ACT, |
| **v.** | ) | 31 U.S.C. §§ 3729, *ET SEQ.* |
| | ) | |
| **HOT SPRINGS NATIONAL PARK** | ) | |
| **HOSPITAL HOLDINGS, LLC** | ) | |
| **D/B/A NATIONAL PARK** | ) | |
| **MEDICAL CENTER** | ) | |
| 1910 Malvern Avenue | ) | |
| Hot Springs, Arkansas 71901 | ) | |
| | ) | |
| **Registered Agent:** | ) | |
| CT Corporation System | ) | |
| 124 West Capitol Avenue Suite 1900 | ) | |
| Little Rock, Arkansas 72201 | ) | |
| & | ) | |
| | ) | |
| **LIFEPOINT HEALTH** | ) | |
| 330 Seven Springs Way | ) | |
| Brentwood, Tennessee 37027 | ) | |
| | ) | |
| **Registered Agent:** | ) | |
| The Corporation Trust Company | ) | |
| 1209 Orange Street | ) | |
| Wilmington, Delaware 19801 | ) | |
| | ) | |
| **KINDRED HEALTHCARE** | ) | |
| | ) | |
| **Registered Agent:** | ) | |
| CT Corporation System | ) | |
| 300 Montvue Road | ) | |
| Knoxville, TN 37919 | ) | |
| | ) | |
| *Defendants.* | ) | **JURY TRIAL DEMANDED** |
| | ) | |

2

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

## INTRODUCTION

1.     *Qui Tam* relator Laura Allen-Moore ("Allen-Moore" or "Relator"), by her attorneys, individually, and on behalf of the United States of America files this Complaint against Defendants National Park Hospital. ("NPH" or collectively referred to as "Defendants") and LifePoint Health ("LifePoint" or collectively referred to as "Defendants") to recover damages, penalties, and attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* ("FCA" or "False Claims Act").

2.     Defendants violate the False Claims Act by admitting ineligible patients into its inpatient rehabilitation facility and subsequently billing federally funded insurances for that care. Defendants also pressure patients into enrolling in its inpatient rehabilitation facility, this is a violation of 42 C.F.R. §482.43. With this conduct, the Defendants knowingly caused false claims for payments to be submitted to the government.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, and 31 U.S.C. § 3732(a)-(b).  This is an action arising under the laws of the United States, specifically the FCA.

4.     The Court has personal jurisdiction over the claims brought because Defendants do business in the Middle District of Tennessee.

5.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. §§ 1391 and 1395(a) because the nature of the misconduct arose from claims submitted from NPH's and

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

LifePoint's rehab facility. LifePoint is a health services company based in Nashville, Tennessee and owns NPH.

6.      Venue in this judicial district and division is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district and this division.

7.      This action is not based on a "public disclosure." This action is based on information that is within the direct and independent knowledge of the Relator. Relator has provided said information to the Government prior to filing this action.

8.      Relator is the "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(B) and have direct and independent knowledge of the allegations set forth in this Complaint.

9.      Pursuant to 31 U.S.C. § 3730(b)(2), Relator has provided the Government with a copy of this Complaint and a written disclosure of substantially all material, evidence, and information in her possession.

## THE PARTIES

### I.     Relator Laura Allen-Moore

10.      Laura Allen-Moore ("Relator" or "Allen-Moore") works in Hot Springs, Arkansas.

11.      Allen-Moore received her degree in accounting from the University of Houston-Clear Lake, Texas in 1998. She is also a certified public accountant.

12.      Allen-Moore has worked in finance for about twenty-five years and has held various roles such as chief financial officer, controller, financial analyst, and director of finance.

13.      On August 23, 2021, Allen-Moore began working for NPMC as the chief financial officer ("CFO").

4

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

Case 3:24-cv-00202    Document 1    Filed 02/22/24    Page 4 of 34 PageID #: 135

14.     Allen-Moore reported directly to Scott Smith, who was the chief executive officer ("CEO"). Scott Smit resigned in or around August 2023. Smith was replaced by Scott Bailey on or around October 2, 2023.

15.     Allen-Moore had employees who report directly to her, including Sarah Hawthorne, who was the case management director.

16.     Allen-Moore resigned from NPMC on December 23, 2023.

## II.     Defendant Hot Springs National Park Hospital Holdings, LLC d/b/a National Park Medical Center

17.     Hot Springs National Park Hospital Holdings, LLC d/b/a National Park Medical Center ("NPMC") is a domestic Delaware corporation located with a foreign filing in Arkansas.

18.     The following are fictitious business names under Hot Springs National Park Hospital Holdings, LLC:

   a.   National Park Medical Center;
   b.   National Park Ambulance Service;
   c.   Hot Springs Imaging Center; and
   d.   The Regional Heart Center.

19.     NPMC is also known as National Park Hospital ("NPH") and was formed in 1954.

20.     NPH is located at 1910 Malvern Avenue, Hot Springs, Arkansas 71901.

21.     Its registered agent is CT Corporation System at 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.

22.     NPH is a 163-bed hospital that provides the following services: diagnostic imaging, inpatient rehabilitation, digestive health, breast cancer, bone and joint health, heart and vascular care, emergency services, and more.

23.     NPH has a rehab practice located in the hospital.

5

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

Case 3:24-cv-00202     Document 1     Filed 02/22/24     Page 5 of 34 PageID #: 136

24. NPH's rehab center is managed by Dr. John Scott Irwin and has a separate NPI.

25. NPH is owned by LifePoint Health ("LifePoint").

26. NPH has four NPIs, each NPI is designated as NPI-Type 2.

27. NPMC's NPI is 1841241833.

28. NPMC Psychiatric Unit's NPI is 1063700243.

29. NPMC Skilled Nursing Facility's ("SNF") NPI is 1639121551.

30. The primary taxonomy listed for NPI 1154330140 is listed as rehabilitation unit.

31. Defendants are all responsible for alleged violations of law by NPH and its parent companies, LifePoint Health and Kindred Healthcare, under "piercing the corporate veil" principles. Under Tennessee law, the most common factors used to determine whether to pierce the corporate veil originate from *Federal Deposit Ins. Corp. v. Allen*, 584 F.Supp. 386, 397 (E.D.Tenn.1984) and are as follows:

    a. (1) whether the entity has been used to work a fraud or injustice in contravention of public policy, (2) whether there was a failure to collect paid in capital; (3) whether the corporation was grossly undercapitalized; (4) the non-issuance of stock certificates; (5) the sole ownership of stock by one individual; (6) the use of the same office or business location; (7) the employment of the same employees or attorneys; (8) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (9) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (10) the use of the corporation as a subterfuge in illegal transactions; (11) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (12) the failure to maintain arm's length relationships among related entities.

    b. No one factor is conclusive; rather, courts will rely upon a combination of factors in deciding the issue. *Oceanics Schools*, 112 S.W.3d at 140; *see also, e.g.*, *VP Buildings, Inc. v. Polygon Group*, 2002 WL 15634, 3 -6 (Tenn. Ct. App. Jan. 8, 2002).

6
*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

Case 3:24-cv-00202    Document 1    Filed 02/22/24    Page 6 of 34 PageID #: 137

c.  Further, "'A corporation's separate identity may be disregarded or "pierced," however, "upon a showing that it is a sham or a dummy or where necessary to accomplish justice.'" *Oceanics* at 140 (quoting *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn.Ct.App.1991).

d.  However, the fact that a shareholder exercises complete dominion and control over a corporation on its own is not sufficient to justify piercing the corporate veil; the party seeking to pierce the corporate veil must also prove that "[s]uch control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights." *Pamperin v. Streamline MFG. INC.*, 276 S.W.3d at 438 (quoting *Continental Bankers Life Ins. Co. v. Bank of Alamo*, 578 S.W.2d at 632); *see also National Precast Crypt Co. v. Dy–Core of Pennsylvania, Inc.,* 785 F.Supp. 1186 (W.D.Pa.1992)

32.  According to the Tennessee Supreme Court, there are three elements used to determine whether a subsidiary corporation is used as a mere instrumentality of a parent corporation. *Continental Bankers Life Ins. Co. of the South v. Bank of Alamo,* 578 S.W.2d 625, 632 (Tenn.1979). The three elements are as follows:

(1) The parent corporation, at the time of transaction complained of, exercises complete dominion over its subsidiary, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the corporate entity, as to that transaction, had no separate mind, will or existence of its own.
(2) Such control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of third parties' rights.
(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id.*

33.  Defendants' ownership and control over their subsidiaries shows no independent decision-making, implementation of a wide ranging plan to exploit the inpatient rehab facility for their own benefit, and use of subsidiary corporations to commit wrongdoing and fraud in violation of the False Claims Act, yet avoid legal responsibility.

### III.  Defendant LifePoint Health

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

34.     LifePoint Health, Inc. ("LifePoint") is a domestic Delaware entity formed in 2009.

35.     LifePoint's headquarters are located at 330 Seven Springs Way, Brentwood, Tennessee 37027.

36.     LifePoint is a health services company based in Nashville, Tennessee.

37.     LifePoint owns approximately 84 hospitals across the U.S, including NPH.

38.     LifePoint considers NPH to be a part of LifePoint. For instance, in NPH's employee handbook, Scott Smith, CEO of NPH, stated, "As part of LifePoint Heath . . . ." This handbook goes on to discuss LifePoint Health values.

39.     On February 23, 2023, Becky Cook, area director of operations for LifePoint Rehabilitation, sent Smith an email telling him that the LifePoint Rehabilitation division is taking on the coding for all of its rehab units.

40.     David Dill is LifePoint's CEO.

41.     Sandy Podley was LifePoint's regional leader for the Western Division. Podley resigned in or around September 2023 and she was replaced with Jen Alderfer.

42.     In 2022, LifePoint merged with Kindred Healthcare, which operates rehab facilities throughout the country, including the in-house rehab facility at NPH.

**IV.     Defendant Kindred Healthcare, Inc.**

43.     Kindred Healthcare, Inc. ("Kindred") was formed in 1985 and was a publicly traded company between 2001 and 2018.

44.     In 2014, Kindred Healthcare purchased Gentiva Health Services.

45.     In 2021, LifePoint acquired Kindred. This transaction formed ScionHealth, which operates over 90 hospitals and eight senior living communities.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

## OVERVIEW OF APPLICABLE LAWS AND REGULATIONS

**I.      The False Claims Act 31 U.S.C. §§ 3729 *et seq.***

46.     The False Claims Act ("FCA") prohibits knowingly presenting, or causing to be presented, to the federal Government a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1).

47.     In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).

48.     The FCA also prohibits conspiring with another person to defraud the Government by getting a false or fraudulent claim allowed or paid by the Government. 31 U.S.C. § 3729(a)(1)(C).

49.     The terms "knowing" and "knowingly" are defined by 31 U.S.C. § 3729(b)(1) to mean that a person "has i) actual knowledge of the information, ii) acts in deliberate ignorance of the truth or falsity of the information, or iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1).

50.     The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

51.     Any person who violates the FCA is liable for civil penalties up to $11,000 per false claim prior to November 2, 2015, as adjusted for inflation, plus three times the amount of damages that the Government sustains as a result of the defendant's actions.  31 U.S.C. § 3729(a).  Civil penalties increased to a minimum of $13,508 and a maximum of $27,018 per false claim for claims assessed after January 30, 2023. See 88 Fed. Reg. 5776 (Jan. 30, 2023). 28 C.F.R. § 85.5.

52.     A claim under the False Claims Act requires the plaintiff to sufficiently allege: "(1) that the defendant [made] a false statement or create[d] a false record (2) with actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity of the information; (3) that the defendant . . . submitted a claim for payment to the federal government; . . . and (4) that the false

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC*
*et al.*

statement or record [was] material to the Government's decision to make the payment sought in the defendant's claim." U.S. ex rel. Sheldon v. Kettering Health Network, 816 F.3d 399, 408 (6th Cir. 2016) (quoting U.S. ex rel. SNAPP, Inc. v. Ford Motor Co., 618 F.3d 505, 509 (6th Cir. 2010)).

## II.    Tennessee False Claims Act

53.    The Tennessee's False Claims Act ("TFCA") makes it unlawful for any person to: (1) knowingly present or cause to be presented to the State a false claim for payment or approval; (2) knowingly make, use, or cause to be made or used a false record or statement to get a false claim paid or approved by the State; (3) conspire to defraud the State by getting a false claim allowed or paid; (4) knowingly make, use, or cause to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay money to the State; or (5) discover an inadvertent false claim and fail to disclose it to the State within a reasonable time after discovery of the false claim. Tenn. Code Ann. § 4-18-103(a)(1)−(5).

54.    An individual who violates TFCA is liable to the State for three times the amount of damages that the State sustains because of the violator, and for a civil penalty of not less than $2,500 and not more than $10,000 for each claim.

55.    TFCA does not apply to false claims in the amount of less than $500. Id. § 4-18-103(d).

## III.    Medicare

56.    In 1965, Congress enacted Title XVIII of the Social Security Act under 42 U.S.C. §§ 1395, et seq. ("The Medicare Program" or "Medicare") authorizing the Federal

CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT
United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.

Government to pay for the cost of certain medical services for persons aged 65 and older through a federally subsidized health insurance program.

57. The United States, through the Department of Human Services ("DHS") and the Centers for Medicare and Medicaid Services ("CMS"), administers and manages the Medicare Program. There are three parts to the Medicare Program. Medicare Program Part A is the relevant part to this case, and it covers inpatient hospital care, rehabilitation care, skilled nursing facilities, hospice, lab tests, surgery, and home health care.

**CMS Requirements for Admitting Patients into Inpatient Rehabilitation Facilities**

58. Inpatient Rehabilitation Facilities ("IRFs") are meant to provide intensive rehabilitation therapy for patients who can reasonably be expected to benefit from an inpatient stay and an interdisciplinary team approach to delivery of rehabilitation services.[1]

59. Patients must be able to participate in and benefit from the intensive rehabilitation therapy program provided in IRFs in order for an IRF claim to be considered reasonable and necessary.[2]

60. According to 1862(a)(1)(A) of the Social Security Act, "No payment may be made under Part A or Part B for any expenses incurred for items or services not reasonable and necessary for the diagnosis or treatment of illness or injury to improve the functioning of a malformed body member."

61. For an IRF to be considered reasonable and necessary, there must be a reasonable expectation that the patient must require active and ongoing therapeutic intervention of multiple

---

[1] *See Chapter 1 – Inpatient Hospital Services Covered Under Part A*, Medicare Benefit Policy Manual (last visited Oct. 2, 2023), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c01.pdf.
[2] *Id*.

11
*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

therapy disciplines (physical therapy, occupational therapy, speech-language pathology, or prosthetics/orthotics therapy), one of which must be physical or occupational therapy. 42 C.F.R. § 412.622(a)(3)(i).

62.     In addition, this intensive rehabilitation therapy program generally consists of at least three hours of therapy (physical therapy, occupational therapy, speech-language pathology, or prosthetics/orthotics therapy) per day at least five days per week. In certain well-documented cases, this intensive rehabilitation therapy program might instead consist of at least 15 hours of intensive rehabilitation therapy per week. Benefit from this intensive rehabilitation therapy program is demonstrated by measurable improvement that will be of practical value to the patient in improving the patient's functional capacity or adaptation to impairments. The required therapy treatments must begin within 36 hours from midnight of the day of admission to the IRF. 42 C.F.R. § 412.622(a)(3)(ii).

63.     The patient must be sufficiently stable at the time of admission to the IRF to be able to actively participate in the intensive rehabilitation therapy program. 42 C.F.R. § 412.622(a)(3)(iii).

**Discharge Planning and Patient Participation**

64.     42 C.F.R. § 482.43 details requirements a hospital must follow to effectively discharge patients from the hospital. These requirements are meant to focus on patient goals and treatment preferences. Ultimately, the purpose of these requirements is to reduce the factors that lead to preventable hospital readmissions.

65.     A discharge planning evaluation must include an evaluation of a patient's likely need for appropriate post-hospital services, including, but not limited to, hospice care services,

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

post-hospital extended care services, home health services, and non-health care services and community based care providers, and must also include a determination of the availability of the appropriate services as well as of the patient's access to those services. 42 C.F.R. § 482.43(a)(2).

66.     In addition, the hospital must assist patients and their families in selecting a post-acute care provider by using and sharing data that is relevant and applicable to the patient's goals of care and treatment preferences. 42 C.F.R. § 482.43(a)(8).

67.     The hospital, as part of the discharge planning process, must inform the patient or the patient's representative of their freedom to choose among participating Medicare providers and suppliers of post-discharge services and must, when possible, respect the patient's or the patient's representative's goals of care and treatment preferences, as well as other preferences they express. The hospital must not specify or otherwise limit the qualified providers or suppliers that are available to the patient. 42 C.F.R. § 482.43(c)(2).

68.     For patients who are discharged home and referred to HHA services, or transferred to an IRF, the hospital must include in the discharge plan a list of HHAs, skilled nursing facilities ("SNFs"), IRFs, or long-term care hospitals ("LTCHs") that are available to the patient, that are participating in the Medicare program, and that serve the geographic area in which the patient resides or requests. 42 C.F.R. § 482.43(c)(1).

69.     The hospital must document in the patient's medical record that the list was presented to the patient or to the patient's representative. 42 C.F.R. § 482.43(c)(1)(iii).

## FACUTAL ALLEGATIONS

***Defendants violate the FCA by admitting unqualified patients into its inpatient rehab facility and billing Medicare for the care rendered to these patients.***

13
*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

Case 3:24-cv-00202     Document 1     Filed 02/22/24     Page 13 of 34 PageID #: 144

70. The hospital at NPH refers patients to its inpatient rehabilitation facility ("IRF").

71. To qualify as an IRF, NPH's rehab center must provide three hours of intensive therapy per day to each patient.

72. When a patient is discharged from the IRF, the patient can go to one of the following locations: home (with or without home health), hospital for short term care, hospital for long term care, skilled nursing facility, hospice care, or psychiatric facility.

73. If a patient is admitted to an IRF and then discharged to any location or care other than the patient's home or home with home health, the patient conceivably did not qualify for IRF and should not have been admitted.

74. The patients do not qualify for the IRF because they can either be discharged to their home or the patients' condition was determined to be better served in a lower level of care than the intensive care an IRF can provide.

75. Patients who were discharged from IRF and went to less restrictive care facilities, such as skilled nursing facilities, were inappropriate for rehab care. The same is true of patients who were discharged from IRF and subsequently died.

76. Between 2019 to 2023, Defendants admitted 1,275 Medicare patients to its IRF. Of that 1,275 patients, 375 patients (29%) were discharged to a less restrictive facility. Since these patients were discharged to less restrictive facilities, they did not qualify for rehab care and Defendants should not have admitted the patients.

77. Of the 375 Medicare patients who were discharged to a less or more restrictive facility, almost ten percent of these patients discharged to NPMC acute hospital resulting in a readmission.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC*
*et al.*

78.     There were 46 readmissions in 2019. Fourteen patients from these readmissions (or 58%) died during the readmission. *See* paragraphs 65–70 for examples.

79.     For example, Patient 1 had a major joint repair on May 24, 2023, and Patient 1 still had a wound vacuum-assisted closure ("VAC") device on an open wound. Patient 1 required geriatric-psychiatry care. The geriatric psychiatrist would not accept Patient 1 until the wound VAC device was removed and the wound was healed. NPH waited five days to transfer Patient 1 to the geriatric/psychiatric unit, which refused to admit Patient 1. NPH then admitted Patient 1 to its IRF on May 31, 2023. The IRF does not usually accept patients with geriatric-psychiatric issues. But the IRF accepted Patient 1 even though Patient 1 had current geriatric-psychiatric issues and was denied admission to the geriatric/psychiatric unit. Patient 1 was not appropriate to be admitted to the IRF.

***Examples of patients who were admitted inappropriately to Defendant's IRF because the patient did not require the advanced care provided by an IRF.***

**Discharge Location: Patient passed away**

80.     IRF care is high-level care that is comparable to an acute hospital stay and reimbursement for this care is very high. Patients should be admitted into hospice care or SNFs because they offer lower levels of care at a lower cost.

81.     Patient 2 was admitted to Defendant's IRF on March 13, 2019. Patient 2 died on his tenth day in IRF. For a patient to qualify for the IRF, the patient must be able to fully participate in and benefit from intensive rehabilitation therapy program prior to transfer from the referring hospital. Since Patient 2 died while in the IRF, it is unlikely he was able to participate in IRF

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

services. Patient 2 required less advanced care than an IRF (such as hospice care or SNF) and was inappropriately admitted.

82.     Patient 3 was admitted to Defendant's IRF on October 21, 2019.Two days after admission, Patient 3 died while in IRF. Patient 3 required less advanced care than an IRF(such as hospice care or SNF) and was inappropriately admitted.

83.     Patient 4 was admitted to Defendant's IRF on March 4, 2020. Patient 4 died in IRF; she was in the IRF for six days before she died. Patient 4 required less advanced care than an IRF (such as hospice care or SNF) and was inappropriately admitted.

84.     Patient 5 was admitted to Defendant's IRF on January 25, 2021. Patient 5 required less advanced care than an IRF (such as hospice care or SNF) and was inappropriately admitted. After sixteen days in the IRF, Patient 5 died.

85.     Patient 6 was admitted to Defendant's IRF on July 28, 2021. Patient 6 required less advanced care than an IRF (such as hospice care or SNF) and was inappropriately admitted. After a ten day stay in IRF, Patient 6 died.

86.     Patient 7 was admitted to Defendant's IRF on August 24, 2021. Patient 7 required less advanced care than an IRF (such as hospice care or SNF) and was inappropriately admitted. After a three day stay in IRF, Patient 7 died.

87.     Patient 8 was admitted to Defendant's IRF on September 16, 2021. Patient 8 required less advanced care than an IRF (such as hospice care or SNF) and was inappropriately admitted. Patient 8 died after a one day stay in IRF.

16
*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

Case 3:24-cv-00202     Document 1     Filed 02/22/24     Page 16 of 34 PageID #: 147

88.    Patient 9 was admitted to Defendant's IRF on June 22, 2022. Patient 9 required less advanced care than an IRF (such as hospice care or SNF) and was inappropriately admitted. Patient 9 died after a three day stay in IRF.

89.    Patient 10 was admitted to Defendant's IRF on March 7, 2023. Patient 10 required less advanced care than an IRF (such as hospice care or SNF) and was inappropriately admitted. Patient 10 died after a ten day stay in IRF.

**Discharge Location: Hospice Care (Home)**

90.    Patient 11 was admitted to Defendant's IRF on December 16, 2019, and was discharged on December 24, 2019. Patient 11 was discharged to hospice care after an eight day stay in IRF. Hospice care requires a medical prognosis of six months or less to live (*see* 42 C.F.R. § 418.22(b)(1)), it is unlikely Patient 11 would have been able to participate in intensive therapy and qualified for the IRF. Patient 11 required more less care than an IRF and was inappropriately admitted.

91.    Patient 12 was admitted to Defendant's IRF on February 25, 2020, and was discharged on March 10, 2020. Patient 12 was discharged to hospice care after a fourteen day stay in IRF. Patient 12 required less advanced care than an IRF since Patient 12 qualified for hospice care. Patient 12 was inappropriately admitted.

92.    Patient 13 was admitted to Defendant's IRF on January 8, 2021, and was discharged on January 22, 2021. Patient 13 was discharged to hospice care after a fourteen day stay in IRF. Patient 13 required less advanced care than an IRF and was inappropriately admitted.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

93.     Patient 14 was admitted to Defendant's IRF on March 15, 2021, and was discharged on March 25, 2021. Patient 14 was discharged to hospice care after a ten day stay in IRF. Patient 14 required less advanced care than an IRF and was inappropriately admitted. Patient 14 was admitted to NPMC's IRF six times between 2019 to 2021.

94.     Patient 15 was admitted to Defendant's IRF on September 13, 2021, and was discharged on September 19, 2021. Patient 15 was discharged to hospice care after a six day stay in IRF. Patient 15 required less advanced care than an IRF and was inappropriately admitted.

95.     Patient 16 was admitted to Defendant's IRF on November 16, 2021, and was discharged on November 29, 2021. Patient 16 was discharged to hospice care after a thirteen day stay in IRF. Patient 16 required less advanced care than an IRF and was inappropriately admitted.

96.     Patient 17 was admitted to Defendant's IRF on November 29, 2021, and was discharged on December 6, 2021. Patient 17 was discharged to hospice care after a seven day stay in IRF. Patient 17 required less advanced care than an IRF and was inappropriately admitted.

97.     Patient 18 was admitted to Defendant's IRF on September 28, 2021, and was discharged on October 11, 2022. Patient 18 was discharged to hospice care after a thirteen day stay in IRF. Patient 18 required less advanced care than an IRF and was inappropriately admitted.

98.     Patient 19 was admitted to Defendant's IRF on October 9, 2022, and was discharged on October 22, 2022. Patient 19 was discharged to hospice care after a thirteen day stay in IRF. Patient 19 required less advanced care than an IRF and was inappropriately admitted.

99.     Patient 20 was admitted to Defendant's IRF on January 27, 2023, and was discharged on February 10, 2023. Patient 20 was discharged to hospice care after a fourteen day stay in IRF. Patient 20 required less advanced care than an IRF and was inappropriately admitted.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC*
*et al.*

**Discharge Location: Hospice Care (Medical Facility)** Patient 21 was admitted to Defendant's IRF on July 16, 2019, and was discharged on July 19, 2019. Patient 21 was discharged to hospice care after a three day stay in IRF. Patient 21 required less advanced care than an IRF and was inappropriately admitted.

100. Patient 22 was admitted to Defendant's IRF on August 30, 2021, and was discharged on September 14, 2021. Patient 22 was discharged to hospice care after a fifteen day stay in IRF. Patient 22 required less advanced care than an IRF and was inappropriately admitted.

101. Patient 23 was admitted to Defendant's IRF on September 14, 2021, and was discharged on September 21, 2021. Patient 23 was discharged to hospice care after a seven day stay in IRF. Patient 23 required less advanced care than an IRF and was inappropriately admitted.

102. Patient 24 was admitted to Defendant's IRF on October 9, 2022, and was discharged on October 17, 2022. Patient 24 was discharged to hospice care after an eight day stay in IRF. Patient 24 required less advanced care than an IRF and was inappropriately admitted.

103. Patient 25 was admitted to Defendant's IRF on November 21, 2022, and was discharged on November 30, 2022. Patient 25 was discharged to hospice care after a nine day stay in IRF. Patient 25 required less advanced care than an IRF and was inappropriately admitted.

*The following examples are further patients who were admitted inappropriately to Defendant's IRF because the patient required less advanced care than provided at an IRF. These examples also call into question whether the patient was informed they had the right to accept or refuse any recommended medical intervention.*

**Discharge Location: Patient Left Against Medical Advice**

104. Patient 26 was admitted to Defendant's IRF on January 18, 2019, and left against medical advice three days later, on January 21, 2019. Since Patient 26 was in a stable condition to

19
*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

Case 3:24-cv-00202    Document 1    Filed 02/22/24    Page 19 of 34 PageID #: 150

leave the IRF against medical advice, Patient 26 was not appropriate for IRF and should not have been admitted.

105. Patient 27 was admitted to Defendant's IRF on September 24, 2019, and left against medical advice on the same day. Since Patient 27 was in a stable condition to leave the IRF against medical advice, Patient 27 was not appropriate for IRF and should not have been admitted.

106. Patient 28 was admitted to Defendant's IRF on October 7, 2019, and left against medical advice five days later on October 12, 2019. Since Patient 27 was in a stable condition to leave the IRF against medical advice, Patient 27 was not appropriate for IRF and should not have been admitted.

107. Patient 29 was admitted to Defendant's IRF on January 13, 2020, and left against medical advice two days later on January 15, 2020. Since Patient 29 was in a stable condition to leave the IRF against medical advice, Patient 29 was not appropriate for IRF and should not have been admitted.

108. Patient 30 was admitted to Defendant's IRF on July 2, 2020, and left against medical advice two days later on July 4, 2020. Since Patient 30 was in a stable condition to leave the IRF against medical advice, Patient 30 was not appropriate for IRF and should not have been admitted.

109. Patient 31 was admitted to Defendant's IRF on September 27, 2021, and left against medical advice one day later on September 28, 2021. Since Patient 31 was in a stable condition to leave the IRF against medical advice, Patient 31 was not appropriate for IRF and should not have been admitted.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC*
*et al.*

110.     Patient 32 was admitted to Defendant's IRF on October 7, 2022, and left against medical advice one day later on October 7, 2021. Since Patient 32 was in a stable condition to leave the IRF against medical advice, Patient 32 was not appropriate for IRF and should not have been admitted.

111.     Patient 33 was admitted to Defendant's IRF on November 21, 2022, and left against medical advice one day later, on November 22, 2022. Since Patient 33 was in a stable condition to leave the IRF against medical advice, Patient 33 was not appropriate for IRF and should not have been admitted.

**Discharge Location: Skilled Nursing Facility**

112.     Patient 34 was admitted to Defendant's IRF on January 8, 2019, and was discharged on January 24, 2019. Patient 34 was discharged after a sixteen day stay in IRF to a skilled nursing facility. Skilled nursing facilities are less restrictive than IRFs. Patient 34 was inappropriately admitted and should have been discharged directly to SNF.

113.     Patient 35 was admitted to Defendant's IRF on January 8, 2019, and was discharged on January 25, 2019. Patient 35 was discharged to a skilled nursing facility after a seventeen day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 35 was inappropriately admitted into the IRF and should have been discharged directly to SNF from the hospital.

114.     Patient 36 was admitted to Defendant's IRF on January 12, 2019, and was discharged on January 25, 2019. Patient 36 was discharged to a skilled nursing facility after a thirteen day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 36 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

115.    Patient 37 was admitted to Defendant's IRF on January 15, 2019, and was discharged on February 2, 2019. Patient 37 was discharged to a skilled nursing facility after a 21 day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 37 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

116.    Patient 38 was admitted to Defendant's IRF on January 24, 2019, and was discharged on February 6, 2019. Patient 38 was discharged to a skilled nursing facility after a thirteen day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 38 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

117.    Patient 39 was admitted to Defendant's IRF on January 25, 2019, and was discharged on February 12, 2019. Patient 39 was discharged to a skilled nursing facility after an eighteen day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 39 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

118.    Patient 40 was admitted to Defendant's IRF on January 26, 2019, and was discharged on February 14, 2019. Patient 40 was discharged to a skilled nursing facility after a nineteen day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 40 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

119.    Patient 41 was admitted to Defendant's IRF on January 31, 2019, and was discharged on February 13, 2019. Patient 41 was discharged to a skilled nursing facility after a

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

thirteen day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 41 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

120.    Patient 42 was admitted to Defendant's IRF on February 6, 2019, and was discharged on February 19, 2019. Patient 42 was discharged to a skilled nursing facility after a thirteen day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 42 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital

121.    Patient 43 was admitted to Defendant's IRF on February 20, 2019, and was discharged on March 8, 2019. Patient 43 was discharged to a skilled nursing facility after a sixteen day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 43 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

122.    Patient 44 was admitted to Defendant's IRF on December 6, 2022, and was discharged on December 13, 2022. Patient 44 was discharged to a skilled nursing facility after a seven day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 44 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

123.    Patient 45 was admitted to Defendant's IRF on December 13, 2022, and was discharged on December 19, 2022. Patient 45 was discharged to a skilled nursing facility after a sixteen day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 45 was

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

124.    Patient 46 was admitted to Defendant's IRF on December 15, 2022, and was discharged on December 28, 2022. Patient 46 was discharged to a skilled nursing facility after a thirteen day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 46 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

125.    Patient 47 was admitted to Defendant's IRF on March 9, 2023, and was discharged on March 22, 2023. Patient 47 was discharged to a skilled nursing facility after a thirteen day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 47 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

126.    Patient 48 was admitted to Defendant's IRF on March 18, 2023, and was discharged on March 30, 2023. Patient 48 was discharged to a skilled nursing facility after a twelve day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 48 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

127.    Patient 49 was admitted to Defendant's IRF on April 5, 2023, and was discharged on April 20, 2023. Patient 49 was discharged to a skilled nursing facility after a fifteen day stay in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 49 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

128.    Patient 50 was admitted to Defendant's IRF on April 7, 2023, and was discharged on April 18, 2023. Patient 50 was discharged to a skilled nursing facility after an eleven day stay

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

in IRF. Skilled nursing facilities are less restrictive than IRFs. Patient 50 was inappropriately admitted into IRF and should have been discharged directly to SNF from the hospital.

***Examples of patients who were discharged to NPMC acute hospital, which resulted in a readmission to short-term general hospital.***

129. Of the 375 Medicare patients who were discharged to a less or more restrictive facility, almost ten percent of these patients were discharged to NPMC acute hospital, which result in readmission.

130. There were 46 readmission cases in 2019. In fourteen of these readmissions (or 58.3%), the patient passed away during the readmission.

131. Patient 51 was admitted to Defendant's IRF from April 7, 2019, to April 22, 2019; from June 6, 2019 to June 13, 2019; and from June 19, 2019, to July 3, 2019. Patient 51 spent fourteen days in NPMC IRF, was readmitted to NPMC acute hospital, and died in three days.

132. Patient 52 was admitted to Defendant's IRF between June 21, 2019, to July 7, 2019. Patient 52 was readmitted after sixteen day NPMC IRF stay. Patient 52 was readmitted to NPMC acute hospital and Patient 52 died in one day.

***Defendants pressure patients into its rehab center, which violates discharge planning and patient participation regulations.***

133. NPH makes a concerted effort to funnel patients into its rehab center.

134. Scott Smith ("Smith") and Dr. John Scott Erwin ("Dr. Erwin) pressure employees to transfer the maximum number of patients from the hospital to the rehab unit. For example, Dr. Erwin spoke at a medical staff meeting where he said the IRF would take any patient and the patient did not need to have an order. Smith was present during this meeting and agreed with Dr. Erwin. Smith also told the staff if they cannot get the patient to agree to rehab, or if there was any

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC*
*et al.*

barrier/resistance with case management, to let him know and he would have administration intervene.

135.    NPH rehab admits a significant amount of patients each month. For example, on June 16, 2023, Amy Robnett (the corporate consultant for rehab division) emailed Smith, Wallace, and Allen-Moore stating, "Volume continues to be very strong, with over 150% admission to budget the last 3 months . . . ."

136.    Further, LifePoint, as the parent company, routinely conducts audits of NPH. LifePoint forewarned NPH that is was overusing its IRF. LifePoint conducted an audit of NPH in April 2023 and provided NPH with its findings. One of the audit findings was NPH admits twice as many patients into its IRF than the state's average. The state's average post-acute care discharge from hospital to the IRF is 7.83% of patients, Defendants average is 15.17%.

137.    The rehab center employees approach patients to convince them they need rehab services prior to the physician issuing an order for rehab.

138.    Since the rehab unit is reaching out to patients early, the patients are agreeing to services they may not otherwise have wanted and without considering their other care options.

139.    Patients are asked to sign choice agreements indicating that they will only go to the NPH rehab unit. The liaisons of the rehab center are not supposed to speak to the patient until this form is signed and the after the physician has signed off on the rehab order.

140.    The rehab liaison consistently violates this rule and leads patients to believe they have no other choice but to go to NPH's rehab center.

141.    NPH holds daily staff meetings (IDT) where the staff rehab liaison, Emily Beard, says her department is "following" a patient. This means that the rehab center was in contact with

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

the patient and planning to bring them into the rehab unit once the patient was discharged from the hospital. This occurs prior to any physicians' order indicating that rehab would be warranted.

142.    According to Relator Allen-Moore, the patients Beard is "following" are not appropriate for rehab; they either were able to be discharged home or their condition was determined to be less severe and did not meet IRF criteria, rendering rehab redundant.

143.    Allen-Moore made Defendants aware of the proper procedures for referring patients to its IRF.

144.    On November 3, 2022, Allen-Moore sent an email to Chief Nursing Officer Lisa Wallace ("Wallace"), Casey Willis ("Willis"), and Bryan Harkness ("Harkness") explaining the document and procedures that are required when patients are referred to the IRF. She stated, "Per the above CMS guidelines, November 30, 2019, the list of post-acute care providers must contain data on the post-acute care providers' quality data . . . the patient is given the list as required. They then note their choice on the Right of Choice form and that form is placed in the medical record as required . . . ."

145.    On January 9, 2023, Lisa Watson, a liaison from Kindred, stated:

> I dug into the CM process a little bit last week and discovered that they do not wait for the therapist's recommendations: acute rehab, SNF, HH, OP … they make the choice themselves, sometimes before the therapist even has a chance to see them. Additionally, they promote SNF as "rehab" which, of course, it is not . . . We've done education many times regarding this topic. Also, they have started discharging patients that we are trying to get precerted because they do not want to wait for a decision because it affects the LOS . . . ."

***When challenged, Defendants refused to change its practices and targeted employees who raised concerns about inappropriate patient admissions.***

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

146.    Allen-Moore hired an employee, Sarah Hawthorne, as the director of case management.

147.    Hawthorne raised her concerns that patients were being inappropriately admitted to management, including Allen-Moore.

148.    Allen-Moore tried to address Hawthorne's concerns with management. On February 2, 2023, Allen-Moore spoke to Lisa Flamm ("Flamm"), who oversees case management for LifePoint, about Hawthorne's concerns. Flamm told Allen-Moore that Hawthorne is a "whistleblower."

149.    Management told Allen-Moore to fire Hawthorne. Allen-Moore refused to fire Hawthorne because she shared Hawthorne's concerns about inappropriate patient admission and she felt firing Hawthorne would not have been justified.

150.    In February 2023, Allen-Moore was placed on a performance improvement plan ("PIP") through March 2023. Allen-Moore met with Smith to discuss her PIP. Smith admonished Allen-Moore for failing to properly manage Hawthorne since Hawthorne was Allen-Moore's report. Smith told Allen-Moore that she needed to "manage her up or manage her out." Hawthorne was removed from Allen-Moore's chain of command and Allen-Moore satisfactorily completed her PIP.

151.    During a meeting on April 17, 2023, Smith was frustrated at the findings of NPH's audit and that it did not provide him with a reason to fire Hawthorne. He also said that the auditor, Lawler, recommended to him that case management should be overseen by Willis rather than Allen-Moore.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

152.     Allen-Moore had a private conversation with Lawler on April 17, 2023, where Lawler admitted that she did not make a recommendation to transfer case management to Willis from Allen-Moore.

153.     Defendants ultimately went around Allen-Moore and terminated Hawthorne.

**COUNT I**
**Violation of the False Claims Act**
**31 U.S.C. § 3729(a)(1)(A)**

154.     Relator incorporates all the allegations set forth in the foregoing paragraphs as though fully alleged herein.

155.     The False Claims Act imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. See 31 U.S.C. § 3729(a)(1)(A).

156.     Defendants knowingly presented or caused to be presented to the government false claims when it bills Medicare for rehab services for patients who do not qualify for such services.

157.     The submission of false claims is material to the government's decision to reimburse the Defendants.

158.     But for Defendants' submission of false claims, the government would not have approved and paid the claims.

159.     The United States of America has been damaged by the aforementioned misrepresentation.

160.     By virtue of these false claims, Defendant is liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

## COUNT II
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

161.    Relator incorporates all the allegations set forth in the foregoing paragraphs as though fully alleged herein.

162.    The False Claims Act imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim. See 31 U.S.C. § 3729(a)(1)(B).

163.    Defendants knowingly caused to be made or made a false record or statement material to a false or fraudulent claim when it falsely certifies patients as qualified to enroll in NPH's IRF.

164.    The false records were material to the government's decision to reimburse the Defendant.

165.    But for Defendants' creation of claims, the government would not have approved and paid the claim.

166.    The United States of America has been damaged by the aforementioned misrepresentation.

167.    By virtue of these false claims, Defendant is liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

## COUNT III
### Violation of the Tennessee False Claims Act
### Tenn. Code Ann. § 4-18-103(a)(1)

168.    Relator incorporates all the allegations set forth in the foregoing paragraphs as though fully alleged herein.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC*
*et al.*

169.    The Tennessee's False Claims Act ("TFCA") makes it unlawful for any person to: (1) knowingly present or cause to be presented to the State a false claim for payment or approval. Tenn. Code Ann. § 4-18-103(a)(1).

170.    Defendants knowingly presented or caused to be presented to the government false claims when it bills Medicare for rehab services for patients who do not qualify for such services.

171.    The submission of false claims is material to the State's decision to reimburse the Defendants.

172.    But for Defendants' submission of false claims, the State would not have approved and paid the claims.

173.    The State of Tennessee has been damaged by the aforementioned misrepresentation.

174.    An individual who violates TFCA is liable to the State for three times the amount of damages that the State sustains because of the violator, and for a civil penalty of not less than $2,500 and not more than $10,000 for each claim.

175.    TFCA does not apply to false claims in the amount of less than $500. *Id.* § 4-18-103(d).

## COUNT IV
### Violation of the Tennessee False Claims Act
### Tenn. Code Ann. § 4-18-103(a)(2)

176.    Relator incorporates all the allegations set forth in the foregoing paragraphs as though fully alleged herein.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

177.    TFCA makes it unlawful for any person to knowingly make, use, or cause to be made or used a false record or statement to get a false claim paid or approved by the State. Tenn. Code Ann. § 4-18-103(a)(2).

178.    Defendants knowingly caused to be made or made a false record or statement material to a false or fraudulent claim when it falsely certifies patients as qualified to enroll in NPH's IRF.

179.    The false records were material to the government's decision to reimburse the Defendant.

180.    But for Defendants' creation of claims, the state would not have approved and paid the claim.

181.    The State of Tennessee has been damaged by the aforementioned misrepresentation.

182.    By virtue of these false claims, Defendant is liable to the United States for incurred damages resulting from such false claims, trebled, plus civil penalties for each violation of the Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator, acting on behalf of herself and in the name of the United States of America and State of Tennessee, demands and prays that judgment be entered against Defendants for violations of the federal False Claims Acts and the Tennessee False Claims Act as follows:

(a)     In favor of the United States against Defendants for treble the amount of damages to the federal government from the submission of false claims, plus the maximum civil penalties for each violation of the Federal False Claims Act.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC*
*et al.*

(b)     In favor of Relator for the maximum amount pursuant to 31 U.S.C. § 3730(d) False Claims Act provision to include reasonable expenses, attorney's fees, and costs incurred by Relator.

(c)     That a trial by jury be held on all issues.

(d)     That, in the event the United States Government or the State of Tennessee elects to intervene in and proceed with this action, Relator be awarded between 15% and 25% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(1).

(e)     That, in the event that the United States Government nor the State of Tennessee does not proceed with this action, Relator be awarded between 25% and 30% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(2).

(f)     That, pursuant to 31 U.S.C. § 3730(c)(5), Relator be awarded a share of any alternate remedy that the United States Government elects to pursue.

(g)     That permanent injunctive relief be granted to prevent any recurrence of the False Claims Act conduct described above for which redress is sought in this Complaint.

(h)     That, pursuant to Tenn. Code Ann. § 71-5-183(d)(1)(A), Relator shall receive at least fifteen percent but no more than twenty-five percent of the proceeds of the action or settlement of the claim.

(i)     That, pursuant to Tenn. Code Ann. § 71-5-182(a), that this Court enter judgment against the Defendants jointly and severally in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendants' actions, and the civil penalty imposed shall be not less than $5,000 and not more than $25,000.

(j)     That the United States Government, the State of Tennessee, and Relator receive all other relief, both in law and equity, to which they may reasonably be entitled.

33

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC et al.*

(k)     For such other and further relief as this Court deems just and proper.


## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this Court, the Relator demands a jury trial as to all issues so triable.


February 22, 2024                    Respectfully Submitted,


                                     /s/*Alan Crone*
                                     Alan Crone, TN Bar No. 14285
                                     The Crone Law Firm, PLC
                                     88 Union Ave, 14th Floor
                                     Memphis, TN 38103
                                     Phone: (901) 737-7740
                                     acrone@cronelawfirmplc.com

                                     R. Scott Oswald
                                     Lydia A. Pappas
                                     The Employment Law Group, P.C.
                                     1717 K Street, N.W., Suite 1110
                                     Washington, D.C. 20006
                                     Telephone: 202.261.2822
                                     soswald@employmentlawgroup.com
                                     lpappas@employmentlawgroup.com

                                     Attorneys for *Qui Tam* Relator

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Laura Allen-Moore v. Hot Springs National Park Hospital Holdings, LLC*
*et al.*